448 F.Supp. 279 (1978)
STRATFORD LAND AND IMPROVEMENT COMPANY, INC. (formerly known as Rykar Industrial Corporation) and Stratford Industrial Corporation, Plaintiffs,
v.
Robert W. BLANCHETTE, Richard C. Bond, and John H. McArthur, Trustees of Penn Central Transportation Company and Consolidated Rail Corporation, Defendants.
Civ. A. No. 77-37.
Special Court Regional Rail Reorganization Act.
March 21, 1978.
*280 *281 Bernard J. Smolens, Philadelphia, Pa. (Gilbert W. Oswald, Charles J. Mangan, Charles B. Blakinger, and Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., of counsel), for plaintiffs.
Paul Duke, Philadelphia, Pa. (Carl Helmetag, Jr., and Robert Szwajkos, Philadelphia, Pa., of counsel), for defendant Trustees of Penn Central Transp. Co.
John G. Harkins, Philadelphia, Pa. (Laurence Z. Shiekman, Charles J. Bloom and Pepper, Hamilton & Scheetz, Philadelphia, Pa., of counsel), for defendant, Consolidated Rail Corp.
Before FRIENDLY, Presiding Judge, and WISDOM and THOMSEN, Judges.
FRIENDLY, Presiding Judge:
Plaintiffs Stratford Land and Improvement Co. and Stratford Industrial Corp. (henceforth referred to collectively as Stratford) commenced this action against ConRail and the Penn Central (PC) Trustees. Stratford sought reimbursement, from ConRail or, alternatively, from the Trustees, of so much of its costs of constructing tracks from the PC line into an industrial park owned by it pursuant to an agreement with the Trustees, approved by the PC reorganization court, as had not been paid by the PC Trustees prior to April 1, 1976. The Trustees filed an answer, contending that this court lacked jurisdiction over the claim against them; they also cross-claimed against ConRail, contending that it, and not they, was liable under the sidetrack agreement on the basis, which also was Stratford's primary assertion, that the agreement was or should have been conveyed to ConRail along with the underlying rail property. ConRail moved to dismiss Stratford's complaint under Fed.R. Civ.P. 12(b)(6) and on the same day filed its answer to the Trustees' cross-claim, seeking its dismissal as well. Thereafter Stratford moved for summary judgment, the Trustees moved for dismissal of the complaint or for a stay of the proceedings against them pending determination in the reorganization court of their liability under the agreement, and ConRail cross-moved for summary judgment against Stratford. Oral argument was heard on January 31, 1978.
The facts are not in dispute. On January 18, 1971, Judge Fullam authorized the PC Trustees to make "refunds" of up to $689,000 to Stratford, in accordance with the terms of a proposed agreement, for the costs Stratford had incurred in constructing tracks into the Stratford Industrial Center. The text of the order is reproduced in the margin.[1] The agreement was signed on May 19, 1971. It noted first that Stratford had constructed the tracks "to the satisfaction of the Area Engineer of the Trustees," and that the Trustees were willing to furnish rail service over the tracks. Stratford agreed, inter alia, to deed to "the Trustees, their successors and assigns," the fee interest in the strip of land on which the tracks lay and easements over other specified property, to transfer to the Trustees, their successors and assigns,

*282 the Lead Tracks, their appurtenances and all materials thereof above the subgrade within the fee and easement areas at the same time as it deeds to the Trustees said fee and easement areas . . .,
to install grade crossing protection, fences, and drainage facilities, to pay extraordinary maintenance expenses for the first three years, and to insure that the necessary clearances were maintained. The Trustees agreed, inter alia,
To refund to the Developers [Stratford], their successors or assigns, so long as they are connected with the Center, (i) the sum of $68,000, being the present day costs of construction of Lead Track Section A; (ii) the Developers' costs of construction of Lead Track Section B and of grade crossing protection which are evidenced to the Trustees as provided in paragraph 1(h) hereof, which costs are now estimated to be six hundred twenty-one thousand dollars ($621,000); and (iii) the Developers' costs of installing any drainage facilities . . . and of extraordinary maintenance . . ..
Refunds were to be paid at a rate dependent upon the revenue yielded by each railroad car traveling over the new tracks. The parties were entitled to terminate the agreement at any time after 10 years or full refund of Stratford's construction costs, whichever occurred first. The agreement further provided that, subject to the jurisdiction of the reorganization court, disputes between Stratford and the Trustees were to be submitted to arbitration.
Stratford transferred the property to the Trustees on April 18, 1973, and the Trustees began rail operations and refund payments. By letter dated February 25, 1976, the Trustees informed Stratford that PC would no longer be engaged in rail operations after the conveyance date and hence the refund agreement would be terminated. On April 1, 1976, pursuant to order of this court, the Trustees conveyed to ConRail the tracks, fee interest and easements which they had acquired under the agreement, and, regarding the agreement as terminated, ceased payments. Refunds of $257,510 had been paid up to that time, leaving $431,490 of the original obligation. Stratford seeks reimbursement for this, as provided in the agreement.
The central dispute here concerns whether the Stratford agreement, particularly the provisions concerning refund obligations, was or should have been conveyed to ConRail along with the real property on April 1, 1976. In urging a negative answer ConRail relies on the Bill of Sale and Assignment between the Trustees and ConRail, a conveyance document certified to this court pursuant to § 209(c) of the Act and annexed to our conveyance order of March 25, 1976. This provided, in Schedule E pertaining to executory contracts and agreements:
[T]he following contracts are expressly reserved and excepted from conveyance to Grantee and Grantee assumes no obligations in connection therewith:
* * * * * *
3. The following:
* * * * * *
c. Other contracts:
* * * * * *
14) SIDE TRACK AGREEMENTS

All industrial side track agreements, track construction or rehabilitation agreements and marine or intermodal terminal development agreements which require the payment of refunds per car, trailer or container to any person, firm, association, cooperative, etc.
Stratford argues that this language does not encompass its agreement with the Trustees; that if it does, the exception is ineffective because it conflicts with the designations of the Final System Plan (FSP); that ConRail in any case is liable under common law and equitable doctrines; and that if this court should find that ConRail is not liable under the agreement, then the Trustees must be. The Trustees join in arguing that ConRail is liable but insist that, if we decide otherwise, their own obligations under the agreement may not be adjudicated in this court. We will consider first the claims against ConRail.

*283 I. Conveyance to ConRail.

Stratford argued in its brief that the exception in the Bill of Sale for sidetrack agreements was intended to apply only to those agreements which would expire if not conveyed to ConRail, which was not the case here. At oral argument, it maintained that the exception was intended to govern only where the property covered by the sidetrack agreement had not been conveyed. No basis has been elaborated for either interpretation, and we can discern none. The exception by its terms applies to "all industrial side track agreements, track construction or rehabilitation agreements," (emphasis supplied) which require the payment of refunds per car. Although the meaning of this seems clear enough, it gains in force when the exception is read in context with the other broad exceptions of Schedule E, see, e. g., ¶¶ 3(c)(1), (2), (3) and (10), which clearly were meant to relieve ConRail of financial burdens incurred by PC or the Trustees. We do not see how the Stratford agreement could more plainly have been excluded from conveyance except by specifically naming it, which was impracticable and unnecessary.[2]
Stratford places heavier reliance on the argument that the exception in the Bill of Sale cannot operate to prevent conveyance of the refund obligation because in its view the provisions of the FSP concerning executory contracts, which are controlling here, called for designation of the Stratford agreement for conveyance. In essence, Stratford asks us to exercise our power under § 209(e)(2) of the Rail Act to effect the goals of the FSP by modifying the conveyance order and striking the exception.[3]
The portion of the FSP here applicable which deals generally with administrative assets was discussed in Matter of Regional Rail Reorganization Proceedings, Trustees of Penn Central Transportation Co. v. Consolidated Rail Corp. (VRD Opinion), 421 F.Supp. 1076, 1078-79 (Special Court 1976). Because of difficulties in itemizing the myriad administrative assets to be conveyed, USRA set forth in the FSP only general principles of designation. The principles here pertinent are as follows:
 Executory contracts and agreements are designated in accordance with their subject matter: contracts relating to property to go with the property, contracts relating to personnel to go with the individuals and contracts relating to services to go with the service obligation.
. . . . .
 Within the overall guidelines set forth above, USRA will oversee the work of a transition task force composed of representatives of the estates, ConRail and the profitable railroads, whose task will be the formulation of detailed inventories of administrative assets as necessary, the negotiation of recommendations to USRA as to the disposition of particular items or categories and the formulation of postconveyance arrangements *284 for sharing items of joint interest. After receiving the recommendations of that task force, USRA will make more definitive designations upon certification of the FSP to the Special Court in accordance with the foregoing designations.
1 FSP 256.
Stratford argues that since the FSP designated the rail property deeded by Stratford to the Trustees by the sidetrack agreement, the agreement as a contract relating to the property must "go" with it.[4] Stratford cites our VRD Opinion as supporting this view. There we considered a challenge to an exception in a conveyance document which excluded group life insurance plans for employees who had not been covered by collective bargaining agreements and also whether the obligations to retirees under PC's Voluntary Relief Department (VRD), as to which there was no exception in the conveyance document, had been conveyed to ConRail. We upheld ConRail's claim that the exception was not inconsistent with the FSP as regards the retirees whose interests were asserted and that the VRD obligations had not been conveyed. From this, Stratford and the Trustee attempt to draw the inference that all executory contracts relating to property which did "go" to ConRail were designated by the FSP provision quoted above. The Trustees also cite the fact that the retirees considered in the VRD Opinion did not go with ConRail as a basis for at least distinguishing the VRD case from this one.
While our decision that ConRail did not assume the group life insurance policies rested in part on the ground that the retirees there concerned did not "go" with ConRail, we also relied on an alternative ground that works against Stratford's contention. We said:
If the "All administrative assets" and "Executory contract" clauses, quoted above, were more ambiguous than we consider them to be, the issue would nevertheless be settled in ConRail's favor by the exception in the bills of sale. It is true enough as a general proposition that what is ultimately controlling is designation in the FSP, its errata sheets and supplements, rather than the conveyance documents; it was because of this that we retained power to correct errors in the latter. But here the FSP itself made clear to Congress that USRA had encountered problems as to administrative assets which it had been unable to solve to the same extent as it had with respect to other properties, that it would continue to work with the estates, ConRail and other transferees, and that, "[w]ithin the overall guidelines set forth above," it would "make more definitive designations upon certification of the FSP to the Special Court."
421 F.Supp. at 1081. USRA quite clearly did not regard the general principles of designation quoted above as the final word on which "executory contracts" would be conveyed. Rather, the Association anticipated, and Congress approved, precisely the sort of refinements USRA later effected in the Bill of Sale. The sidetrack exception was wholly consistent with the general scheme of the Rail Act and of the FSP that ConRail was to emerge with the rail properties designated for it, for which just compensation would be paid, but without the attending financial obligations.[5] We see no *285 force in Stratford's argument that the May, 1971 agreement cannot be burdensome since ConRail can avoid any refund payments simply by not moving cars over the track. ConRail is obligated by both § 1(18) of the Interstate Commerce Act and § 304(a) of the Rail Act to furnish rail service on properties conveyed to it until it is relieved by appropriate administrative action. A requirement that ConRail assume all of a transferor's executory obligations related to the properties conveyed would run counter to the basic design of the FSP to develop a "financially self-sustaining and express service system in the region." § 206(a)(1). We therefore hold that the sidetrack exception in the Bill of Sale was not inconsistent with the FSP.
We reject on similar grounds Stratford's attempt to treat ConRail as the Penn Central's successor-in-interest or assignee of benefits under the sidetrack agreement, bound as such to fulfill the obligations thereunder. However such an argument might stand if we were simply applying the common law, see Forest Laboratories, Inc. v. Pillsbury Co., 452 F.2d 621 (7 Cir. 1971), the care with which Congress delineated the rights and obligations to be conveyed, see, e. g., § 303(b)(2), (3), (4), and the intent behind what has previously been found to be at least in part a bankruptcy statute, Rail Act Cases, 419 U.S. 102, 152-55, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), that ConRail should begin operations without burdensome liabilities insofar as possible, belie the notion that common law doctrines were to apply under the Rail Act.[6] Neither do we discern how there will be unjust enrichment if ConRail is permitted to use the sidetracks conveyed by Stratford to the PC Trustees and by them to ConRail but is not required to refund to Stratford the balance of its cost of constructing them. The Government will eventually have to pay PC the constitutional minimum value of the sidetracks and Stratford will have whatever claim against these payments or other portions of the PC estate for the unpaid balance which the law allows.
We therefore hold that Stratford's complaint and the Trustees' cross-claim against ConRail must be dismissed.

II. Claims Against the Trustees.

Stratford argues that if ConRail is not liable under the agreement, the Trustees must be since no provision of the Rail Act extinguishes the obligation. It argues further that this court has jurisdiction to determine the Trustees' liability by virtue of § 209(e)(2) of the Rail Act, which provides in relevant part:
The original and exclusive jurisdiction of the special court shall include any action, whether filed by any interested person or initiated by the special court itself, to interpret, alter, amend, modify or implement any of the orders entered by such court pursuant to section 303(b) of *286 this Act in order to effect the purposes of this Act or the goals of the final system plan.
We have already determined that the sidetrack agreement remained with the Trustees. The questions whether they must continue to make refund payments, whether the obligation was extinguished because PC cars no longer used the rail property, or whether Stratford is entitled to special recognition against amounts identifiable as just compensation for the sidetrack are solely a matter of interpretation of the agreement and Judge Fullam's order of January 18, 1971, and the application of principles of reorganization law. Such questions do not fall within the compass of § 209(e)(2), or any of the other provisions of § 209(e). As we noted in Consolidated Rail Corp. v. Illinois, 423 F.Supp. 941, 948 (Special Court 1976), cert. denied, 429 U.S. 1095, 97 S.Ct. 1111, 51 L.Ed.2d 542 (1977), § 209(e) does not encompass all claims "relating to the [Rail] Act." See also Consolidated Rail Corp. v. National Rail Passenger Corp., Civ.No. 77-39 (Special Court, Dec. 7, 1977).[7] The relation here, if it exists at all, is attenuated.
In response to the Trustees' argument that the bankruptcy court has exclusive jurisdiction over this dispute, Stratford cites to us 28 U.S.C. § 959(a), which provides that
Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury.
While the statute might have permitted Stratford to sue the PC Trustees in some court other than the reorganization court, it is not an independent grant of subject matter jurisdiction. Cf. Diners Club, Inc. v. Bumb, 421 F.2d 396, 399 (9 Cir. 1970); 2 Collier, Bankruptcy ¶ 23.13[2] (14th ed. 1972). We have found that the Rail Act does not grant us jurisdiction to adjudicate the controversy between Stratford and the Trustees; section 959 does not confer upon us authority which the Rail Act withholds.
Stratford argues finally that this court should exercise its ancillary jurisdiction over the Trustees in order to decide the entire case before it. Even if our ancillary jurisdiction should extend thus far, a difficult question which has not been adequately briefed, we would decline to exercise it. The doctrine, like that of pendent jurisdiction, was fashioned to serve the ends of "judicial economy, convenience and fairness to litigants," United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); Warren G. Kleban Engineering Corp. v. Caldwell, 490 F.2d 800, 802 (5 Cir. 1974). Hence, its exercise is committed to the discretion of the court. Rosario v. American Export-Isbrandtsen Lines, Inc., 531 F.2d 1227, 1233 n.17 (3 Cir.), cert. denied, 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976); Bay Guardian Co. v. Chronicle Publishing Co., 340 F.Supp. 76, 79 (N.D.Cal.1972); 3 Moore, Federal Practice ¶ 14.27[1] at 14-570, 574 (2d ed. 1974). Where, as here, the bankruptcy court considered and in effect approved the agreement we are asked to interpret, we think the plaintiffs can get a "surer-footed" interpretation in that forum. Cf. Gibbs, supra, 383 U.S. at 726, 86 S.Ct. 1130. Stratford's *287 claim will be one of hundreds on which the reorganization court will have to pass; we would unwarrantably interfere with its work by singling out this claim for determination by us. The fact that the sidetrack agreement provided for arbitration of disputes at the request of either party subject to the jurisdiction of the bankruptcy court is an additional reason for our not exercising jurisdiction. Assumption of jurisdiction would not serve the end of uniformity in the interpretation of the Rail Act since the Act is at best tangentially implicated by this issue, or in any way involve the "central functions" of this court. Cf. Consolidated Rail Corp. v. Illinois, supra, 423 F.Supp. at 949. We therefore dismiss Stratford's complaint against the PC Trustees for want of jurisdiction.
The complaint of Stratford and the cross-claim of the Trustees against ConRail are dismissed for failure to state a claim upon which relief may be granted. Stratford's claim against the Trustees is dismissed for want of jurisdiction. The Clerk will enter judgment accordingly.
NOTES
[1] AND NOW, this 18th day of January, 1971, in consideration of the Petition of Trustees for Authority to Make Track Refunds to Rykar Industrial Corporation and Stratford Industrial Corporation, it is ORDERED that:

1. The Trustees and their representatives are authorized to make refunds to Rykar Industrial Corporation and Stratford Industrial Corporation for the costs of construction of lead tracks extending a distance of approximately 14,010 feet to the Stratford Industrial Center at Stratford, Connecticut. The refunds shall be made in accordance with the terms of a proposed agreement, a copy of which was presented to this Court for the January 18, 1971 hearing on this Petition of the Trustees. Such refunds shall not exceed the amount of $689,000. The refunding of any further amounts, for the costs of additional drainage facilities (referred to in paragraph 1(c) of the proposed agreement) or for extraordinary maintenance (referred to in paragraph 1(g) of the proposed agreement), shall be subject to the approval of this Court.
2. The Trustees and their representatives are authorized to take such action as may be necessary and proper to accomplish the foregoing.
Rykar Industrial Corp. is the previous name of Stratford Land and Improvement Co.
[2] At oral argument, Stratford observed that the agreement described the tracks constructed as "Lead Tracks" whereas the exception in the Bill of Sale refers to "side tracks." However, we were not informed what if any significance this terminological distinction bears. In light of the broad language and obvious purpose of the exception in the Bill of Sale, we think the distinction is without significance, and we will use the term "sidetrack" throughout this opinion to describe the agreement and the property in question.

We also note that both parties to the Bill of Sale, the Trustees and ConRail, consider the exception applicable to the agreement although the Trustees argue against its validity.
[3] ConRail points out that the power to correct conveyances which we reserved in § 5 of the conveyance order of March 25, 1976 was limited to applications by transferors or transferees and did not extend to applications of third parties. However, the PC Trustees join in Stratford's application. Moreover, § 209(e)(2) would enable us to entertain a correction application quite apart from the reservation in § 5 of the conveyance order. In light of the conclusions reached hereafter, we have no occasion to consider ConRail's contention that, under § 209(e)(1)(C), we lack power to make the correction here sought unless we find that in making the sidetrack exception the Association acted "in reckless or deliberate disregard of applicable law."
[4] ConRail argues that the refund obligation could not have been conveyed because § 303(b) authorizes conveyance only of "rail properties" and the refund obligation did not fall within the definition thereof specified in § 102(12):

assets or rights owned, leased or otherwise controlled by a railroad . . . which are used or useful in rail transportation service . . ..
ConRail contends that the refund obligation was neither an asset nor a right and was not used or useful in transportation service.
The argument is misdirected. USRA could have designated the sidetrack agreement as a whole, which embodied both rights and obligations. The agreement did constitute an asset of the Penn Central which was useful for operations. See 1 FSP 254-55. USRA chose not to do so.
[5] There is no force in Stratford's argument based on the provision in § 303(b)(2) that conveyances shall be

subject to such leases and agreements as shall have previously burdened such properties or bound the owner or operator thereof in pursuance of an arrangement with any State, or local or regional transportation authority under which financial support from such State, or local or regional transportation authority was being provided at the time of enactment of this Act for the continuance of rail passenger service or any lien or encumbrance of no greater than 5 years' duration which is necessary for the contractual performance by any person of duties related to public health or sanitation.
The "in pursuance" clause qualifies the entire provision. Stratford's broader construction would subject ConRail to a lessee's liability under all leases of transferors with respect to designated propertysomething Congress manifestly did not intend.
[6] Plaintiffs cite the decision of the New York State Department of Transportation, which held ConRail to be the Penn Central's successor-in-interest with respect to the property under investigation there and consequently subject to the Department's safety orders, and the decision of the ICC in Cincinnati, New Orleans & Texas Pacific Ry. v. Akron, Canton & Youngstown R.R., 353 I.C.C. 165 (1976), which held that ConRail was the successor-in-interest of the defendants in that proceeding whose operations it had assumed and was therefore subject to Commission rate and division orders previously in effect. The holdings that ConRail is subject to the regulatory authority binding its predecessors hardly imply that it is bound as well to assume financial obligations to nongovernmental bodies when those obligations were not conveyed to it in accordance with the provisions of the Rail Act.
[7] Stratford's reliance on the cited decision is misplaced. In the portion of that opinion pertinent to the instant case, we upheld Amtrak's assertion "that any determination by the reorganization court that the PCTC Trustees' track maintenance pre-conveyance obligation passed to ConRail, even if only advanced as a reason for denying Amtrak's claim against the Trustees, would be one which the reorganization court had no jurisdiction to make." Our decision in Part I of this opinion that the Trustees' undischarged obligations under the Stratford agreement did not pass to ConRail will preclude the reorganization court from deciding the contrary. In contrast to the cited cases, there is thus no further need for us to impinge upon the reorganization court in order to protect ConRail from liabilities not envisaged by Congress.